## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## CHARLESTON DIVISION

FONDA LYNN SANFORD,  )
   **Plaintiff,**   )
        )
**v.**         )   **CIVIL ACTION NO. 2:14-16724**
        )
CAROLYN W. COLVIN,   )
**Acting Commissioner of Social Security,** )
   **Defendant.**   )

### PROPOSED FINDINGS AND RECOMMENDATION

   This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. By Standing Order entered May 22, 2014 (Document No. 4.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit Proposed Findings of Fact and Recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross-Motions for Judgment on the Pleadings. (Document Nos. 11 and 12.)

   The Plaintiff, Fonda Lynn Sanford (hereinafter referred to as "Claimant"), filed applications for DIB and SSI on September 10, 2010 (protective filing date), alleging disability as of September 16, 2008, due to scoliosis, asthmatic bronchitis, attention deficit disorder, learning disabilities, thyroid problems, anxiety, and depression.[1] (Tr. at 13, 167, 169-72, 173-79, 205, 209.)  By letter from her representative dated October 2, 2012, Claimant amended her alleged onset date to August

---

[1] On her form Disability Report - Appeal, Claimant asserted that her depression had become severe and that her pain was constant. (Tr. at 248.) Additionally, she reported paranoia, severe breathing difficulties, and an inability to focus as additional disabling impairments. (*Id.*)

1, 2009. (Tr. at 13, 201.) The claims were denied initially and upon reconsideration. (Tr. at 13, 78-81, 84-86, 89-91, 106-08, 110-12.) On May 25, 2011, Claimant requested a hearing before an Administrative Law Judge (ALJ). (Tr. at 113-14.) A hearing was held on November 1, 2012, before the Honorable Jack Penca. (Tr. at 32-61.)   By decision dated November 13, 2012, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 13-24.) The ALJ's decision became the final decision of the Commissioner on March 26, 2014, when the Appeals Council denied Claimant's request for review. (Tr. at 1-5.) Claimant filed the present action seeking judicial review of the administrative decision on May 21, 2014, pursuant to 42 U.S.C. § 405(g). (Document No. 2.)

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2012). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e),

2

416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2012). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

> *(c) Rating the degree of functional limitation.* (1)Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in

which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[2] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder

_____

[2] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since the amended alleged onset date, August 1, 2009. (Tr. at 15, Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from "degenerative disc disease, asthma/bronchitis, depression, anxiety disorder, and borderline personality disorder," which were severe impairments. (Tr. at 15, Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 16, Finding No. 4.) The ALJ then found that Claimant had a residual functional capacity ("RFC") to perform a full range of work at all exertional levels with the following limitations:

> [S]he can occasionally kneel, crouch, and crawl. She should avoid concentrated exposure to fumes, odors, gases, and poor ventilation. She retains the ability to perform simple, routine, and repetitive tasks. She would not be able to engage work with fast pace or strict production requirements. She would be able to tolerate a

5

position with occasional decision making and occasional changes in the work setting. She could further tolerate occasional interaction with supervisors, coworkers, and the public.

(Tr. at 18, Finding No. 5.) At step four, the ALJ found that Claimant could not return to her past relevant work. (Tr. at 23, Finding No. 6.) On the basis of testimony of a Vocational Expert ("VE") taken at the administrative hearing, the ALJ concluded that Claimant could perform jobs such as a cleaner, price marker, and mail sorter, at the unskilled, light level of exertion, and as a cleaner, at the unskilled, medium level of exertion. (Tr. at 23-34, Finding No. 10.) On this basis, benefits were denied. (Tr. at 24, Finding No. 11.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

6

Claimant's Background

Claimant was born on May 1, 1960, and was 52 years old at the time of the administrative hearing, November 1, 2012. (Tr. at 23, 38, 169, 173.) The ALJ found that Claimant had at least a high school education and was able to communicate in English. (Tr. at 23, 40, 208, 210.) In the past, she worked as a dietary aide. (Tr. at 23, 55, 210, 219-26.)

The Medical Record

The Court has considered all evidence of record, including the medical evidence and discusses it herein in relation to Claimant's arguments.

Physical Impairments:

Prior to filing her applications for benefits, Plaintiff had an MRI of her cervical spine which revealed a right paramedian disc herniation at C5-6, with associated spinal cord deformity but no signal abnormality within the spinal cord. (Tr. at 287-88.) Claimant also had severe neural foraminal narrowing at C5-6 and moderate narrowing at C6-7. (Tr. at 287.) On September 7, 2007, x-rays revealed moderate to severe degenerative disc disease with uncovertebral arthrosis at C5-7. (Tr. at 286.) On September 7, 2007, Claimant presented to Med Express with complaints of cervical pain that radiated down her left arm, for which she was prescribed Vicodin and Flexeril. (Tr. at 276-79.) Progress notes from Riverview Health Clinic indicate that on September 14, 2007, Claimant was fifteen percent better with treatment. (Tr. at 282.) On September 19, it was noted that she was "about 75% better." (Tr. at 281.) On September 21, progress notes demonstrate that Claimant's pain was much improved and on September 25, that she was doing well. (Tr. at 280.)

Progress notes from Camden-Clark Memorial Hospital, dated October 20, 2008, indicate that Claimant was diagnosed again with asthmatic bronchitis and was discharged home with a prescription for Albuterol Inhaler I. (Tr. at 309.) On examination, it was noted that her neck was

supple and had full range of motion. (Tr. at 310.) She also had full range of back motion and presented no tenderness. (Id.)

On May 19, 2011, Sandra Swisher, FNP, BC, referred Claimant to Mountain River Physical Therapy regarding her neck pain. (Tr. at 423.)

Claimant was treated for hypothyroidism, including nodules, with Levothyroxine. (Tr. at 389-404.) She was discharged from medical care in October 2010, due to the results of drug testing on July 16, 2010, which revealed a positive screen for amphetamines. (Tr. at 399-400, 403-04.)

Claimant presented to EZCare Medical Center on February 19, 2009, with complaints of wheezing and drainage. (Tr. at 292-93.) There is no indication that she reported any back or neck pain and physical examination revealed a normal and supple neck. (Tr. at 293.) She was diagnosed with bronchitis. (Id.) An abdominal ultrasound on February 18, 2010, revealed marked dextrosclerotic curvature at the thoracic spine with mild levocurvator at the lower lumbar spine. (Tr. at 322.)

On December 6, 2010, Dr. Loretto Auvil, M.D., completed a form General Physical report for the West Virginia Department of Health and Human Resources. (Tr. at 474-76.) Dr. Auvil diagnosed degenerative disc disease due to her pain in lower back and neck, among other conditions, but noted that her posture and gait were normal. (Tr. at 474-75.) He opined that Claimant was unable to work and that lifting should be avoided. (Tr. at 475.) Dr. Auvil noted that Claimant was unable to pay for needed medication. (Tr. at 476.)

On March 10, 2011, Dr. Stephen Nutter, M.D., performed a consultative examination. (Tr. at 364-72.) Claimant reported neck pain with a four-year history that was caused by jamming her head against a vehicle roof. (Tr. at 364.) She also reported shortness of breath and problems breathing, with a diagnosis of asthma. (Tr. at 365.) She indicated that she was able to walk one mile

before she had to stop due to shortness of breath and that she had wheezing and coughing. (Id.) Claimant smoked and used inhalers. (Id.) Dr. Nutter observed that Claimant walked with a normal gait and without assistive devices. (Id.) He noted that her intellectual functioning was normal but that her recent and remote memory for medical events was fair and somewhat vague. (Id.) She had evidence of crepitus of her right shoulder, bilateral knee pain with squatting, and decreased range of her cervical and lumbar spine, with some tenderness and pain. (Id.) Straight leg raising testing was normal. (Tr. at 366-67.) Claimant was able to stand on one leg without difficulty, perform tandem gait without difficulty, and had normal muscle strength throughout. (Tr. at 367.) Dr. Nutter noted that Claimant had no sensory abnormalities, normal reflexes and muscle strength testing, and an absence of nerve root compression. (Id.) He assessed chronic cervical, thoracic, and lumbar strain and asthma. (Id.) An x-ray of Claimant's lumbar spine on March 10, 2011, was normal with slight right convex scoliosis of the upper lumbar spine. (Tr. at 368.) Pulmonary functioning testing on that same date revealed mild restrictive pulmonary disease. (Tr. at 371.)

On April 4, 2011, Dr. Thomas Lauderman, D.O., a state agency reviewing physician, completed a form Physical RFC Assessment, on which he opined that Claimant was capable of performing work at all exertional levels with a requirement that she avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, and other environmental pollutants. (Tr. at 373-81.) In reaching his opinion, Dr. Lauderman considered the consultative examination by Dr. Nutter and the accompanying lumbar x-ray and pulmonary function study. (Tr. at 380.) He noted Claimant's activities to have included performing personal care, preparing meals, cleaning but at a slower pace, lifting over 20 pounds, and walking six blocks. (Id.) Dr. Porfirio Pascasio, M.D., affirmed Dr. Lauderman's opinion as written on April 28, 2011. (Tr. at 384.)

On May 19, 2011, Claimant presented to Ritchie Regional Health Center for her "well

woman exam." (Tr. at 416-17.) Sandra Swisher noted her complaints of neck pain, but indicated on exam that her neck was normal, with no decrease in suppleness. (Id.) Ms. Swisher noted however, that Claimant had abnormalities of her cervical, thoracic, and lumbar spine, though the only mentioned abnormality was "obvious scoliosis" and that Claimant's right scapula was higher than her left. (Tr. at 417.) On June 16, 2011, requested refills of Mobic, which she reported helped her pain a lot. (Tr. at 415.) On exam, Sandra Swisher observed that her neck was normal, with no decrease in suppleness. (Id.) Ms. Swisher noted Claimant's reports of back pain and other symptoms, but found on exam that there was no costovertebral angle tenderness and that her neck was normal. (Id.) On November 23, 2011, Claimant requested a letter of disability. (Tr. at 412-13.)

Claimant underwent chiropractic treatment from October 18 through November 26, 2011. (Tr. at 386-88.)

Claimant presented to Physicians Care Express on September 24, 2012, with complaints of low and mid-back pain and right upper arm pain, from which she believed was due to having "moved the wrong way." (Tr. at 488.) She was diagnosed with a back sprain and was discharged in stable condition. (Id.) Claimant also reported to Marietta Memorial Hospital Urgent Care on September 24, 2012, with complaints of lower back pain that was worse with any twisting. (Tr. at 489.) She described the pain as sharp in nature and indicated that it was not improved in the absence of movement. (Id.) She also reported similar pain between her shoulder blades with cramping in the right arm. (Id.) She was assessed with back sprain and was given a supportive cane and advised to rest and massage the area for one to two days. (Id.) She was instructed to avoid lifting until the pain resolved. (Id.)

On October 17, 2012, Claimant presented to Marietta Memorial Hospital, where she was assessed with low back and neck pain, shortness of breath, depression, and anxiety. (Tr. at 503-04.)

10

The x-rays of Claimant's lumbar spine on October 17, 2012, indicated prominent levoscoliosis centered at the L2-L3 level with a slight rotary component and mild degenerative change. (Tr. at 507.) The x-rays of her cervical spine revealed a straightening of the normal lordoctic curvature; disc space narrowing at C5-6 and C6-7 with endplate irregularity, sclerosis, and ostephyte formation; mild mid to lower cervical unconvertebral spurring; C6-7 left osseous foraminal stenosis and right C5-6 osseous foraminal stenosis; and a prominent thoracic dextroscoliosis. (Tr. at 508.)

Mental Impairments:

On February 10, 2009, requested "something for anxiety" but there is no indication that she was prescribed any medication. (Tr. at 306-07, 392.) On February 7, 2010, it was noted at Riverview Primary Care that Claimant had a history of ADD. (Tr. at 305.) It was noted that her anxiety and depression had worsened since her breakup with her boyfriend. (Tr. at 303.) It was noted on October 20, 2008, that Claimant was positive for anxiety and depression at Camden-Clark Memorial Hospital. (Tr. at 310.)

On August 31, 2010, Valerie Keller, PA-C, completed a comprehensive psychiatric evaluation. (Tr. at 433-34.) Claimant reported a several year history of depression, ADD, and ADHD. (Tr. at 433.) She indicated that she always was sad and wanted to sleep, and wanted to smoke and drink more to calm her nerves. (Id.) She reported problems with worrying and obsessing, mood swings, difficulty focusing and remembering, and was very talkative. (Id.) Ms. Keller noted that Claimant was very organized. (Id.) On mental status exam, Ms. Keller observed that she had a neutral mood and appropriate affect, relevant thought content, clear and fast speech, full orientation though she was fidgety, fair insight and judgment, intact recent and remote memory, and poor concentration. (Tr. at 434.) Ms. Keller diagnosed ADHD; major depression, moderate; and anxiety disorder NOS. (Id.) She prescribed Adderall XR for her attention and Lexapro for her

anxiety and depression symptoms. (<u>Id.</u>) Ms. Keller opined that Claimant's prognosis for treatment was good and that Claimant was motivated for treatment. (<u>Id.</u>)

Psychological treatment notes from Schwabe & Associates revealed that on September 28, 2010, Claimant was diagnosed with ADHD and generalized anxiety disorder, and was assessed with a GAF of 68. (Tr. at 330.) Mental status exam revealed a good mood and appropriate affect, relevant thought content and clear thought process and speech, fair judgment and insight, full orientation, intact association, an improved attention span and concentration with Adderall, normal psychomotor activity, and intact memory. (Tr. at 330-31.) She was prescribed Adderall for ADHD, Lexapro for depression, and Klonopin for anxiety. (Tr. at 331.) Claimant reported on October 26, 2010, that she was "doing ok" but felt like a black cloud was around her due to the stress between her and her daughter and boyfriend. (Tr. at 332.) She complained of anxiety and panic disorder. (<u>Id.</u>) On exam, it was noted that Claimant's mood was up and down, with an anxious and tearful affect. (<u>Id.</u>) She had good attention span and concentration. (<u>Id.</u>) The exam otherwise remained unchanged. (Tr. at 332-33.) She was continued on her Adderall and additionally was prescribed Paxil and Cymbalta. (Tr. at 333.)

Ms. Keller noted on September 28, 2010, that Claimant's attention and concentration were better with Adderall. (Tr. at 486.) On October 26, 2010, she noted that Claimant was "still doing ok," and that her attention span and concentration were good. (Tr. at 484-85.) Also on October 26, 2010, Ms. Keller completed a form Physician's Summary for the WVDHHR on which she opined that Claimant's ability to work was limited by her panic attacks, difficulty concentrating, and difficulty completing tasks in a timely manner. (Tr. at 483.) Ms. Keller opined that Claimant's prognosis was "good." (<u>Id.</u>)

On December 6, 2010, Dr. Auvil, completed a form General Physical report for the West

Virginia Department of Health and Human Resources, on which he opined that Claimant was unable to work in part due to ADHD and depressive/anxiety disorders. (Tr. at 474-77.)

Melodye Jill Hornish, M.A., a licensed psychologist, conducted a psychological evaluation on November 19, 2010. (Tr. at 478-82.) Ms. Hornish noted that Claimant was compliant, had normal posture and gait, and drove herself to the evaluation. (Tr. at 478.) Claimant reported that she had applied for disability due to asthma and bronchitis, scoliosis, moderate to severe joint degeneration, and a curvature of her spine. (Id.) Claimant also noted that she had an underactive thyroid, anxiety panic disorder, and ADD. (Id.) She reported poor memory and reading comprehension, fatigue, panic attacks, frequent crying spells, low energy, restlessness, racing thoughts, and excessive worrying. (Tr. at 479.) On mental status exam, Ms. Hornish observed that Claimant exhibited an inappropriate air of familiarity and poor boundaries, normal speech, fair grammar, full orientation, alternating hypomanic and dysphoric moods, a labile affect, tangential thought processes, poor insight, moderately deficient psychomotor behavior, normal judgment, normal immediate and recent memory, mildly deficient remote memory, moderately deficient concentration and pace, normal persistence, and moderately deficient social functioning. (Tr. at 480-81.) Claimant denied any history of suicidal or homicidal ideation. (Tr. at 481.)

Ms. Hornish noted Claimant's activities to have included cleaning, grocery shopping, cooking, doing laundry, and reading. (Id.) Ms. Hornish diagnosed anxiety disorder NOS and borderline personality disorder and assessed a GAF of 42. (Tr. at 482.) She further opined that Claimant's prognosis was guarded with psychiatric monitoring and prescribed medications. (Id.)

On January 24, 2011, Paula A. Dunn, Ph.D., conducted a psychological evaluation at the request of the state agency. (Tr. at 334-44.) Regarding her ADHD, Claimant reported that she cried easily, was a nail biter, and hyperventilated a lot. (Tr. at 336.) She reported that she was backward

13

as a child, had memory problems, sits and rocks, had mood swings that resulted in anger and crying, and was distractible somewhat. (Id.) Regarding her depression, the Beck Depression Inventory-II suggested mild symptoms of depression. (Tr. at 336-37.) Claimant indicated that she slept an average of eight hours a day and awakened feeling rested and had a decreased appetite. (Tr. at 337.) Dr. Dunn noted that Claimant went off on tangents and gave elaborate and unnecessary details of events, which made interviewing and testing her difficult. (Id.) Claimant required constant redirection. (Id.)

On mental status exam, Dr. Dunn noted that Claimant exhibited slowed motor activity, low energy, blank and sad facial expressions, and had a labile affect with a mixture of depression and anxiety, accompanied by inappropriate laughter. (Tr. at 338.) Her mood was irritable and depressed, significant rapport was never established, she cooperated but was defensive, and she displayed a below-average level of eye contact. (Id.) Dr. Dunn further noted that Claimant, at times, exhibited rapid and pressured or very slow speech and disorganized thought content, had coherent and clear speech, was oriented except to location, and obsessed on her physical symptoms. (Tr. at 338-39.) Claimant had normal concentration and immediate and recent memory, her remote memory and social functioning were  moderately deficient, her judgment was mildly deficient, and her persistence and pace were severely deficient. (Tr. at 339.) Claimant reported daily activities to have included watching television, thinking about what she needed to do during the day, talking to and texting friends, and crying over her daughter. (Tr. at 339-40.)

Intellectual testing revealed a Full Scale IQ score of 89, which was in the low-average range. (Tr. at 340.) Dr. Dunn noted that it was difficult to summarize Claimant's intellectual functioning in a single score, but noted that her nonverbal reasoning abilities exceeded her verbal abilities. (Id.) Dr. Dunn opined that the test results were a valid estimate of Claimant's IQ. (Tr. at 341.) Results

of the WRAT-4 indicated that Claimant performed word reading at an eleventh grade level, sentence comprehension and math at a seventh grade level, and spelling at a twelfth grade level. (Id.) Dr. Dunn opined that the results were valid. (Id.) Dr. Dunn diagnosed dysthmic disorder, borderline personality disorder, and assessed a GAF of 60. (Tr. at 342.) She opined that Claimant's prognosis was poor because she was not receiving counseling and that she marginally was able to manage her funds. (Id.)

On February 3, 2011, Dr. Joseph A. Shaver, Ph.D., a state agency reviewing consultant, completed a form Psychiatric Review Technique, on which he opined that Claimant's dysthymic disorder and borderline personality disorder resulted in mild limitations of activities of daily living; moderate difficulties in maintaining social functioning, concentration, persistence, or pace; and no episodes of decompensation. (Tr. at 345-59.) Dr. Shaver also completed a form Mental RFC Assessment, on which he opined that Claimant's mental impairments resulted in moderate limitations in her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to accept instructions and respond appropriately to criticism from supervisors; and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. at 360-62.) He opined that she was not limited significantly in all other functional categories. (Id.) Dr. Dunn noted that Claimant's daily activities, which included cooking, cleaning, shopping, and handling her personal finances, were secondary to her physical condition. (Tr. at 362.) Dr. Frank D. Roman, Ed.D., reviewed Dr. Shaver's opinion and affirmed it as written on April 28, 2011. (Tr. at 382.)

Ms. Keller's treatment notes reflected changes in Claimant's medications and the overall finding that she was "doing well." Progress Notes from February 8, 2011, demonstrated that Claimant was doing well and was assessed a GAF of 65. (Tr. at 452-53.) On July 13, 2011, Ms.

15

Keller noted that Claimant remained nervous and sometimes, was shaky. (Tr. at 445-46.) On August 10, 2011, it was noted that she was "doing fine," with good attention. (Tr. at 443-44.) On September 7, 2011, Claimant reported that she was doing good and Ms. Keller likewise noted that she was "doing well," and that her anxiety and depression fairly well were controlled. (Tr. at 441-42.) Ms. Keller noted on November 2, 2011, that Claimant was "doing ok," had good attention, and had no symptoms of depression or anxiety. (Tr. at 437-38.) Finally, Ms. Keller noted on November 30, 2011, that Claimant was doing well, had good attention, her mood was "ok," and that Ms. Keller had no concerns. (Tr. at 435-36.)

On March 27, 2012, it was noted at O'Bleness Memorial Hospital that Claimant was diagnosed with depression and anxiety, for which she took Citalopram. (Tr. at 405-06.)

On August 2, 2012, Claimant established treatment at Marietta Memorial-Hospital. (Tr. at 473.) Kimberly Spencer, CNP, noted Claimant's reports of worsening depression since she quit working in 2009, and a history of anxiety dating back to her high school years. (Id.) Ms. Spencer noted on exam that claimant was depressed, sad, anxious, possessed anger control issues, and reported homicidal and suicidal ideations. (Id.) Ms. Spencer assessed depression and ADD, and adjusted her medications. (Tr. at 472.)

John R. Atkinson, M.A., a licensed psychologist, completed a form Mental Assessment of Ability to Do Work-Related Activities on October 18, 2012. (Tr. at 490-92.) Mr. Atkinson opined that Claimant was limited markedly in her ability to maintain attention/concentration, use judgment, interact with supervisors, deal with work stresses, relate predictably in social situations, and understand, remember, and carry out complex job instructions. (Tr. at 491-92.) He indicated that she was limited moderately in her ability to relate to co-workers, deal with the public, behave in an emotionally stable manner, complete a normal work day and work week without interruptions from

16

psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and understand, remember, and carry out detailed but not complex job instructions. (Id.) Finally, he opined that Claimant was limited slightly in her ability to follow work rules, function independently, and understand, remember, and carry out simple job instructions. (Id.) In all other mental functional categories, Mr. Atkinson found no limitations. (Id.) In support of his findings, he noted that Claimant had a cognitive disorder. (Tr. at 491.)

Mr. Atkinson also conducted a psychological evaluation on October 18, 2012. (Tr. at 493-502.) Mr. Atkinson initially observed that Claimant was cooperative but displayed an odd or puzzled look at times, which he interpreted as signs of cognitive processing dysfunction. (Tr. at 493.) Claimant cooperated adequately and maintained a normal gait and posture. (Id.) Claimant reported memory difficulties, panic attacks, low energy level and fatigue, depression, anxiety, obsessive thoughts, mildly compulsive behavior, and a fear of sharp objects. (Tr. at 494-95.) She indicated that her depression had decreased to approximately two times a month for maybe a day and that she had experienced panic attacks since the age of 14 and that the episodes lasted for ten to 15 minutes. (Tr. at 494.)

On mental status exam, Mr. Atkinson noted that Claimant easily established social rapport, was well oriented, exhibited relevant and coherent speech patterns that were relevant to the conversation, possessed normal judgment and average insight, and had normal memory, concentration, attention, abstract reasoning, and social functioning. (Tr. at 498-500.) He noted that she was of normal intelligence, had slightly slowed psychomotor behavior and pace, and exhibited average persistence. (Tr. at 499-500.) Results of the MMPI-II indicated a primary peak on the depression scale and a slightly lower peak on the hysteric side, which Mr. Atkinson opined was consistent with Claimant's history and mental status examination. (Tr. at 499.) Mr. Atkinson

17

concluded that Claimant's history highly was suggestive of borderline personality traits and histrionic predisposition. (Tr. at 500.) Although Claimant reported ADHD, Mr. Atkinson believed that she never had the disorder. (Id.) He diagnosed depressive disorder NOS, with elements of alesithymic depression; anxiety disorder NOS; cognitive disorder NOS; and assessed a GAF of 55. (Tr. at 500-01.) He opined that her prognosis was uncertain. (Tr. at 501.)

Claimant's Challenges to the Commissioner's Decision

Claimant alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ failed to evaluate properly her physical and mental impairments and resulting functional limitations. (Document No. 11 at 6-14.) Regarding her physical RFC, Claimant asserts that while the ALJ provided an overview of the radiological evidence and Dr. Nutter's evaluation, his summary was incomplete and failed to include key evidence, such as Dr. Nutter's reduced ranges of motion of the spine, pelvic and abdominal CT scan reports, and results from cervical x-rays and MRI from 2004 through 2007. (Id. at 9-10.) Respecting mental impairments, Claimant asserts that the ALJ failed to follow the special technique required in evaluating mental impairments. (Id. at 10-14.) She asserts that the ALJ considered only the Adult Function Report to the exclusion of evidence by the SSA Field Office, Schwabe and Associates, Dr. Nutter, Dr. Dunn, and Ms. Hornish. (Id. at 10-13.)

In response, the Commissioner asserts, respecting Claimant's physical impairments, that the ALJ acknowledged the several radiological findings that demonstrated scoliosis and degenerative changes in her spine, which undermined Claimant's reports of debilitating pain. (Document No. 12 at 11-12.) The ALJ also acknowledged Claimant's statements reported in her functional report, which contradicted her hearing testimony. (Id. at 12.) Thus, the ALJ properly determined that she had no exertional limitations, but in giving Claimant the benefit of the doubt, assessed occasional

18

postural limitations to kneeling, crouching, and crawling. (Id.) The Commissioner notes that Claimant fails to address meaningfully the evidence but rather asserts that the ALJ's assessment was incomplete and failed to include all evidence. (Id. at 12-13.) Contrary to Claimant's allegations, the Commissioner asserts that the ALJ considered Dr. Nutter's report and devoted nearly half a page in his decision to discussing the report. (Id. at 13.) Similarly, the ALJ referenced the radiological findings at least four times in his decision. (Id.) The ALJ concluded, based upon the medical evidence and Claimant's reported daily activities, that no additional limitations were warranted. (Id.) The Commissioner therefore asserts, that the ALJ's RFC assessment is supported by the substantial evidence of record. (Id. at 13-14.)

Claimant also alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ failed to evaluate properly her credibility. (Document No. 11 at 14-16.) Claimant asserts that the ALJ failed to explain how her physical impairments were inconsistent with the evidence and failed to weigh properly the factors utilized in weighing credibility, in violation of SSR 96-7p. (Id. at 15-16.) Rather, she asserts that the ALJ focused on non-specific statements regarding the limited care she provided her grandchild, her ability to do household chores, and her activities of daily living while disregarding observations by medical source providers. (Id. at 15.)

In response, the Commissioner asserts that despite Claimant's allegations, the ALJ articulated specific reasons for his credibility finding, which reasons are well-supported by the evidence. (Id. at 18.) Specifically, Claimant alleged an ability to stand only 15 minutes but the records demonstrated a consistent steady gait and normal examination findings. (Id.) Two state agency physicians opined that Claimant had no exertional limitations, but the ALJ gave Claimant the benefit of the doubt and limited her to only occasional kneeling, crouching, and crawling. (Id.)

Furthermore, the Commissioner asserts that Claimant reported a wide-range of activities of daily living, which did not support further limitations. (Id. at 18-19.) Regarding her mental limitations, the Commissioner asserts that the ALJ specifically considered progress notes from Schwabe and Associates, her reported activities, and the reports of two state agency psychologists. (Id. at 19.) The Commissioner therefore contends that the ALJ's mental RFC analysis is supported by the substantial evidence of record. (Id.)

Analysis.

1. RFC Assessment.

Claimant first alleges that the ALJ erred in assessing her RFC. (Document No. 11 at 6-14.) "RFC represents the most that an individual can do despite his or her limitations or restrictions." See Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34476 (1996). Pursuant to SSR 96-8p, the RFC assessment "must be based on all of the relevant evidence in the case record," including " the effects of treatment" and the "limitations or restrictions imposed by the mechanics of treatment; e.g., frequency of treatment, duration, disruption to routine, side effects of medication." Looking at all the relevant evidence, the ALJ must consider the claimant's ability to meet the physical, mental, sensory and other demands of any job. 20 C.F.R. §§ 404.1545(a), 416.945(a) (2012). "This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)." Id. "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996).

Opinions on a claimant's Residual Functional Capacity are issues that are reserved to the

Commissioner. The Regulations state that:

> We use medical sources, including your treating source, to provide evidence, including opinions, on the nature and severity of your impairment(s). Although we consider opinions from medical sources on issues such as whether your impairment(s) meets or equals the requirements of any impairment(s) in the Listing of Impairments in appendix 1 to subpart P of part 404 of this chapter, your residual functional capacity . . . or the application of vocational factors, the final responsibility for deciding these issues is reserved to the Commissioner.

See 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2) (2012).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physicians' opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

The Regulations state that opinions on these issues are not medical opinions as described in the Regulation dealing with opinion evidence (20 C.F.R. §§ 404.1527(a)(2) and 416.927(a)(2)); rather, they are opinions on issues reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e) and 416.927(e). For that reason, the Regulations make clear that "[w]e will not give any special significance to the source of an opinion on issues reserved to the Commissioner. . . ." Id. §§ 404.1527(e)(3) and 416.927(e)(3). The Regulations further provide that "[f]or cases at the Administrative Law Judge hearing or Appeals Council level, the responsibility for deciding your residual functional capacity rests with the Administrative Law Judge or Appeals Council." See 20 C.F.R. §§ 404.1545 and 416.946 (2012). However, the adjudicator must still apply the applicable factors in 20 C.F.R. § 416.927(d) when evaluating the opinions of medical sources on issues reserved to the Commissioner. See Social Securing Ruling ("SSR") 96-5p, 61 FR 34471, 34473 (1996).

Social Security Ruling 96-5p makes a distinction between an RFC assessment, which is "the adjudicator's ultimate finding of 'what you can still do despite your limitations,'" and a "'medical source statement,' which is a 'statement about what you can still do despite your impairment(s)' made by an individual's medical source and based on that source's own medical findings." Id. SSR 96-5p states that "[a] medical source statement is evidence that is submitted to SSA by an individual's medical source reflecting the source's opinion based on his or her own knowledge, while an RFC assessment is the adjudicator's ultimate finding based on a consideration of this opinion and all the other evidence in the case record about what an individual can do despite his or her impairment(s)." Adjudicators "must weigh medical source statements under the rules set out in 20 C.F.R. § 416.927, providing appropriate explanations for accepting or rejecting such opinions." Id. at 34474.

Regarding Claimant's physical impairments, the ALJ acknowledged and summarized the medical evidence. The ALJ acknowledged that the record contained several radiological findings, which essentially demonstrated scoliosis and degenerative changes in her spine. (Tr. at 19.) Despite x-rays in 2011 that revealed a slight curvature of the upper lumbar spine, Claimant maintained a steady gait, was able to stand on one leg at a time, and had full muscle strength. Dr. Nutter's examination failed to reveal any significant deficiencies. Although Dr. Nutter indicated some reduced ranges of neck and back motion, he did not indicate that the reduced motions were significant. Additionally Claimant reported numerous activities in her Function Report. (Tr. at 17.) The ALJ also acknowledged the opinion evidence, which revealed two state agency opinions that her physical impairments were non-severe and without exertional limitations. Given this evidence, the ALJ concluded that Claimant was capable of a full range of work at all exertional levels with

22

some occasional postural limitations and environmental limitations. (Tr. at 18.)

Respecting Claimant's mental impairments, the ALJ summarized the treatment records from Schwabe and Associates, which indicated that medication was effective in controlling Claimant's symptoms. (Tr. at 20-21.) Examination findings consistently were unremarkable. Ms. Hornish evaluated Claimant in November 2010, which revealed deficient psychomotor behavior, concentration, and pace. (Tr. at 20.) Dr. Dunn assessed a GAF of 60 and Mr. Atkinson noted a neutral mood and broad affect. (Tr. at 20-21.) In general, Claimant's condition was stable and her medication was effective in controlling her symptoms.

The ALJ also considered Claimant's self-reports that she got along well with others and interacted with family and friends. (Tr. at 235-37.) She was able to read, play cards, manage her finances, and watch movies. (Id.) This evidence suggested that her attention and concentration were not as deficient as alleged. The ALJ also considered the opinion evidence of record, including the opinion of Dr. Dunn, Ms. Hornish, Mr. Atkinson, Ms. Keller, and Dr. Shaver. (Tr. at 20-22.)

In view of the foregoing, the undersigned finds that the ALJ adequately considered the evidence relating to Claimant's mental impairments and that his decision that she could perform work activity limited to simple, routine, and repetitive tasks without fast pace or production requirements that allowed occasional interaction with supervisors, co-workers, and the public is supported by the substantial evidence of record.

Accordingly, the undersigned finds that the ALJ's RFC assessment is supported by substantial evidence.

2. Pain and Credibility.

Claimant also alleges that the ALJ erred in assessing her credibility. (Document No. 11 at 14-

23

16.) A two-step process is used to determine whether a claimant is disabled by pain or other symptoms. First, objective medical evidence must show the existence of a medical impairment that reasonably could be expected to produce the pain or symptoms alleged. 20 C.F.R. §§ 404.1529(b) and 416.929(b) (2012); SSR 96-7p; See also, Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996). If such an impairment is established, then the intensity and persistence of the pain or symptoms and the extent to which they affect a claimant's ability to work must be evaluated. Id. at 595. When a claimant proves the existence of a medical condition that could cause the alleged pain or symptoms, "the claimant's subjective complaints [of pain] must be considered by the Secretary, and these complaints may not be rejected merely because the severity of pain cannot be proved by objective medical evidence." Mickles v. Shalala, 29 F.3d 918, 919 (4th Cir. 1994). Objective medical evidence of pain should be gathered and considered, but the absence of such evidence is not determinative. Hyatt v. Sullivan, 899 F.2d 329, 337 (4th Cir. 1990). A claimant's symptoms, including pain, are considered to diminish her capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical and other evidence. 20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4) (2012). Additionally, the Regulations provide that:

> [w]e will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your treating, examining, or consulting physician or psychologist, and observations by our employees and other persons. . . . Factors relevant to your symptoms, such as pain, which we will consider include:
>
> (i) Your daily activities;
>
> (ii) The location, duration, frequency, and intensity of your pain or other symptoms.
>
> (iii) Precipitating and aggravating factors;
>
> (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;

24

(v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;

(vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 or 20 minutes every hour, sleeping on a board, etc.); and

(vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3) (2012).

SSR 96-7p repeats the two-step regulatory provisions:

First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the individual's pain or other symptoms. * * * If there is no medically determinable physical or mental impairment(s), or if there is a medically determinable physical or mental impairment(s) but the impairment(s) could not reasonably be expected to produce the individual's pain or other symptoms, the symptoms cannot be found to affect the individual's ability to do basic work activities.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

SSR 96-7p, 1996 WL 374186 (July 2, 1996). SSR 96-7p specifically requires consideration of the "type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms" in assessing the credibility of an individual's statements. Significantly, SSR 96-7p requires the adjudicator to engage in the credibility assessment as early as step two in the sequential analysis; i.e., the ALJ must consider the impact of the symptoms on a claimant's ability to function along with the objective medical and other evidence in determining whether the claimant's impairment is "severe" within the meaning of the Regulations. A "severe"

impairment is one which significantly limits the physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1520(c) and 416.920(c).

Craig and SSR 96-7p provide that although an ALJ may look for objective medical evidence of an underlying impairment capable of causing the type of pain alleged, the ALJ is not to reject a claimant's allegations solely because there is no objective medical evidence of the pain itself. Craig, 76 F.3d at 585, 594; SSR 96-7p ("the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record"). For example, the allegations of a person who has a condition capable of causing pain may not be rejected simply because there is no evidence of "reduced joint motion, muscle spasms, deteriorating tissues [or] redness" to corroborate the extent of the pain. Id. at 595. Nevertheless, Craig does not prevent an ALJ from considering the lack of objective evidence of the pain or the lack of other corroborating evidence as factors in his decision. The only analysis which Craig prohibits is one in which the ALJ rejects allegations of pain solely because the pain itself is not supported by objective medical evidence.

The ALJ noted the requirements of the applicable law and Regulations with regard to assessing pain, symptoms, and credibility. (Tr. at 18.) The ALJ found at the first step of the analysis that Claimant's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (Tr. at 18.) Thus, the ALJ made an adequate threshold finding and proceeded to consider the intensity and persistence of Claimant's alleged symptoms and the extent to which they affected Claimant's ability to work. (Tr. at 18-22.) At the second step of the analysis, the ALJ concluded that Claimant's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible. The residual functional capacity assessment above contains all limitations reasonably supported by the [C]laimant's credible testimony concerning the intensity, persistence, and limiting effects of her symptoms and by the objective medical evidence in the record." (Tr. at 18-198)

26

Claimant asserts that the ALJ failed to explain how her physical impairments were inconsistent with the medical evidence and failed to weigh the factors set forth in the Regulations. (Document No. 11 at 15-16.) The undersigned finds that the ALJ's credibility assessment is supported by substantial evidence of record. The ALJ began his credibility assessment by considering Claimant's testimony, which indicated that she could stand ten to 15 minutes and lift up to 20 pounds. (Tr. at 18.) As summarized above however, the medical evidence demonstrated that Claimant consistently presented on examinations with a steady gait and the examination resulted in essentially unremarkable findings. Claimant had some pain with range of motion testing, and some reduced range of neck and back motion, but nothing that caused concern to the examiners, including Dr. Nutter. Furthermore, Dr. Lauderman and Dr Pascasio found that Claimant's physical impairments were non-severe. (Tr. at 21.)

The ALJ specifically summarized the medical evidence of record and considered the nature of Claimant's physical impairments and his treatment. The ALJ also considered Claimant's reported activities of daily living, which discredited her subjective symptoms. (Tr. at 19.) The ALJ concluded that despite some scoliosis and degenerative changes on diagnostic studies, Claimant was able to stand on one leg at a time without difficulty, maintained a normal gait, and was able to care for children and perform household chores. (Id.) Consequently, the ALJ considered Claimant's physical impairments pursuant to the Regulations but determined that the evidence did not support the degree of limitation Claimant alleged. Accordingly, the undersigned finds that the ALJ's credibility assessment is supported by substantial evidence.

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Plaintiff's Motion for Judgment on the Pleadings (Document No. 11.), **GRANT** the Defendant's Motion for Judgment on the Pleadings (Document No. 12.), **AFFIRM** the final decision of the

Commissioner, and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have three days (mailing/service) and then fourteen days (filing of objections) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155, 106 S.Ct. 466, 475, 88 L.Ed.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Johnston, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to send a copy of the same to counsel of record.

Date: August 31, 2015.

R. Clarke VanDervort
United States Magistrate Judge